(56 South. 371.)

No. 18,443.

TULANE EDUCATIONAL FUND'S ADM'RS v. BACCICH & DE MONTLUZIN.

(June 15, 1911. Rehearing Denied Oct. 30, 1911.)

*(Syllabus by Editorial Staff.)*

1. EVIDENCE (§ 427*)—PAROL EVIDENCE—AUTHORITY OF AGENT.

Code, art. 3012, provides that a mandatory who has communicated his authority to a person with whom he contracts in that capacity is not answerable to the latter for anything done beyond it, unless he has entered into a personal guaranty. Article 3013 declares that a mandatory is responsible to those with whom he contracts only when he has bound himself personally, or when he has exceeded his authority without having exhibited his powers. *Held* that, the exhibition of an agent's authority to the person with whom he deals being a matter dehors the contract, proof of such exhibition may be made by parol.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 427.*]

2. BROKERS (§ 106*)—AUTHORITY—COMMUNICATION—EVIDENCE.

Evidence *held* insufficient to warrant a finding that defendants, before giving an option to plaintiffs' broker to purchase certain land, disclosed to such broker the fact that they did not have written authority to sell a portion of the land covered by the option.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 106.*]

3. BROKERS (§ 100*) — CONTRACT — ACTS BEYOND AUTHORITY—DAMAGES—BAD FAITH.

Where defendants, acting as real estate brokers, at the time they executed an option authorizing plaintiffs' agent to purchase a large tract of land, acknowledged that defendants had no authority to sell a portion of the land contained in the tract, they were guilty of legal bad faith within Code, art. 1934, providing that, where the object of the contract is anything but the payment of money the damages due shall be the amount of the creditor's loss and the profit of which he has been deprived, and, in case the execution of the contract has proceeded from fraud or bad faith, the debtor shall be liable, not only for such damages as were or might have been foreseen at the time of making the contract, but also as to such as are the immediate and direct consequence of the breach of the contract, so that plaintiffs, having been compelled to purchase such part of the land from the owner at a price higher than that specified in the option, were not limited to a recovery of the difference between the option price and the value of the land, but were entitled to recover the difference between the option price and what they were compelled to pay.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 100.*]

4. DAMAGES (§ 23*)—CONTEMPLATION OF PARTIES.

Plaintiffs' agent applied to defendants for an option to purchase a large tract of land. Defendants, without notifying plaintiffs' agent that they had no written authority to sell a part of the tract, issued the option including such part, and plaintiffs were thereafter compelled to pay the owner an increased price in order to carry out the scheme for which the tract was desired. *Held* that, defendants having notice that plaintiffs desired to secure the entire tract, the difference between the option price and what plaintiffs were compelled to pay the owner for such part of the land could properly be held to have reasonably entered into contemplation of the parties as the damages plaintiffs would sustain from defendants' inability to convey such part, though they did not know the purpose for which the land was desired or the identity of the purchasers.

[Ed. Note.—For other cases, see Damages, Dec. Dig. § 23.*]

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by the administrators of the Tulane Educational Fund against Baccich & De Montluzin. Judgment for defendants, and plaintiffs appeal. Reversed and rendered.

Monte M. Lemann, Ralph J. Schwarz, Merrick, Lewis, Gensler & Schwarz, and Hall, Monroe & Lemann, for appellants. Carroll, Henderson & Carroll, for appellees.

PROVOSTY, J. The administrators of Tulane Educational Fund, wishing to acquire a large area of land in this city for the expansion of Tulane University employed a real estate agent, J. S. Saxton, to secure options from the numerous owners of the city lots that would have to be blocked together for making up the desired extent. The defendant firm and the two members of the firm individually owned some of these lots, and held themselves out as having authority to sell others of them, and Saxton executed with them two contracts, one of which only need be reproduced here, as the two are

word for word alike, except as to price and description of property:

"State of Louisiana, Parish of Orleans.

"We the undersigned, Baccich & De Montluzin, agents, do hereby agree and bind myself to sell to John Albion Saxton, agent, his successors or assigns, the following described property in the city of New Orleans, to wit, lots 60, 62, 72, 74, 80, 82, 84, 86, 88, 90, 67, 69, 71, 73, 75, 77, 83, 85, 87, and 89, making twenty lots in all, in block No. 2, Audubon Place, as per plan of Edgar Pilie, dated February 17, 1906, subject to restrictions and benefits now bearing on said property.

"The price of this agreed sale is the sum of thirty-one thousand and fifty-nine ($31,059.00) dollars cash, of which I acknowledge receipt of the sum of three thousand one hundred and five $90/100$ ($3,105.90) dollars in part payment, the balance of the price to be paid at time of the execution of the formal deed to be passed before a notary to be designated by said Saxton, at the expense of the purchasers, as soon as titles can be examined, but not later than sixty days from this date. Said deed is to be made to the said Saxton, agent, or to any person he may name. Titles to be delivered to the said Saxton for examination within five days from this date.

"I, the undersigned, John Albion Saxton, agent, do hereby agree to buy the aforesaid property at the aforesaid price and terms, and do agree to close said sale within sixty days from this date.

"All rights to withdraw from this agreement by either party under the provisions of the Civil Code of Louisiana are specially waived by both parties.

"Taxes for 1908 and preceding years to be paid by seller.

"Thus done and signed this 14th day of November, 1908."

Among the lots included in these contracts were lots 64, 66, 72, and 74 belonging to W. V. Woodworth.

When Saxton had, as he thought, secured options on all the desired lots, he reported to the plaintiffs, and was instructed by them to close the options. It then developed that the defendants had had no authority, or, at any rate, no written authority, from Mr. Woodworth to sell his lots; and it became necessary for the plaintiffs to buy the lots from Mr. Woodworth on the best terms they could make with him, and they did so, and now sue defendants for the difference between the amount which they thus had to pay and the amount which they would have paid if defendants had carried out their contract.

[1] The defense is that defendants "exhibited their powers" to Saxton, or, in other words, informed him that they had no authority to sell the said lots, but only hoped to be able to obtain the authority, and that, therefore, they are not liable in damages under articles 3012 and 3013 of the Code, reading:

"Art. 3012. The mandatory, who has communicated his authority to a person with whom he contracts in that capacity, is not answerable to the latter for anything done beyond it, unless he has entered into a personal guarantee.

"Art. 3013. The mandatory is responsible to those with whom he contracts, only when he has bound himself personally, or when he has exceeded his authority without having exhibited his powers."

When defendants offered to prove, by their own testimony and that of another witness, that they had informed Saxton of their having no authority, objection was made to the evidence on the ground that parol evidence was inadmissible to vary or contradict the written contract, that the contract necessarily presupposed authority to make it, and hence that the fact of having such authority entered into and formed part of the contract, and that, therefore, this parol evidence would vary or contradict the contract in that respect.

The learned trial judge first admitted the evidence, and then, later, changed his ruling. The original ruling was right. The exhibition of his authority by an agent is a matter dehors the contract, and which, in the nature of things, can be proved only by parol. Of course, the parties might create written evidence of it by drawing up and signing an instrument containing the recital of such exhibition having been made; but the document would be useful only as an admission. It would not evidence a contract. Parties cannot contract that one of them has exhibited his power of attorney to the other. The fact of such exhibition having been made is

simply a matter of fact, not a matter of agreement. In like manner the fact of the person assuming to act as agent having, or not having, informed the persons he was contracting with that he did not have authority to make the contract, is a matter of fact dehors the contract, and necessarily provable by parol evidence.

[2] But, when we come to consider the evidence upon that point, we have to conclude that Mr. Saxton, when he testifies positively that the defendants did not inform him of their not having written authority, is to be believed, and that the other gentlemen, though they testify with equal positiveness, are in some way mistaken. It is so utterly improbable that Mr. Saxton would have accepted this option if he had known that defendants had no authority to give it. He was a business man, and was acting under positive instructions to secure the entire tract of land or none. Past experience had warned the plaintiffs of the great caution that would have to be exercised in their attempt to get together, or block, a large area for their intended purpose; and they had warned Mr. Saxton of the importance of making absolutely sure of whatever options he might obtain, and, to that end, Mr. E. H. Farrar, member and legal adviser of the plaintiff board, had furnished him with an iron-clad form for use in drawing up the options. Under these circumstances, that he should have consented to accept an option from some one without authority from the owner to give it is, we say, utterly improbable. True, his testimony stands one to three, but his statement is in accord with the probabilities of the matter, and is corroborated by the following letter:

"New Orleans, Nov. 12, 1908.
"John Albion Saxton, Esq., New Orleans.
"Dear Sir: We are authorized to sell lots in block No. 2, Audubon Place, as follows: Lots 52 and 54, belonging to E. F. Sporl, for $3,700; lots 79 and 81, belonging to W. B. Dozier, for $3,500; lots 64 and 66, belonging to Warren V. Woodworth, for $3,300; lots 76 and 78, belonging to Geo. S. Cox, for $3,500, and lots 48 and 50, belonging to J. D. Hunter, for $3,600.
"Although we have quoted you the lots of Mr. Hunter, above, we must advise that we have not his authority in writing, and if, for any reason, there should be a hitch with him (which we do not believe), we don't want to be held to the above quotation.
"Yours very truly,
"Baccich & De Montluzin."

The defendants say the information of their want of authority was communicated to Saxton on November 14, 1908, at the time the contracts sued on were executed; that is to say, two days after the date of this letter. This letter is not susceptible of any other construction than that the writers of it had authority in writing from all the parties named in it except Mr. Hunter. Especially must this letter be so understood when read in connection with another letter written two days previously, in which defendants informed Saxton that they "had authority" from several parties named in the letter, and had "verbal authority" from some other parties named, thereby clearly indicating that they understood perfectly that mere oral authority to sell real estate was no authority; and, indeed, what real estate man but does so understand?

The statement of the two defendants that they had oral authority from Woodworth is contradicted by the latter; but the point is unimportant.

[3] Coming to the question of the measure of damages, the learned counsel for defendants contend that the measure of damages in this case, as in all other cases for the breach of a contract of sale on the part of the vendor, is the difference between the contract price and the market price of the thing sold, and that, as the contract price in this case was the full market value of the thing sold, the damages are nil, or merely nominal. Plaintiffs, on the other hand, contend that the rule here invoked by defendants has application only in cases where by going

into the market and paying the market price the purchaser can secure the equivalent of the thing called for by his contract; but that in the nature of things it can have no application in a case like the present, where the thing sold and agreed to be delivered is unique, and cannot be duplicated in the market; that the paramount rule in the matter of damages is that the complainant must be compensated or indemnified, or, in other words, made whole, as far as circumstances will permit; that all other rules are merely subsidiary, mere aids in the application of this cardinal rule; that in a case such as the present the would-be purchaser is not made whole, unless he is refunded the surplus amount he has had to pay for the acquisition of the property which formed the object of the contract.

This question of the proper measure of the damages in cases of breach of contract is not a new one in the civil law; and the provisions of our Code on the subject are very clear and precise.

"Art. 1934. Where the object of the contract is anything but the payment of the money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:

"1st. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. By bad faith in this and the next rule is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.

"2nd. When the execution of the contract has proceeded from fraud or bad faith, the debtor shall not only be liable to such damages as were, or might have been foreseen at the time of making the contract, but also to such as are the immediate and direct consequence of the breach of that contract, but even when there is fraud, the damages cannot exceed this."

"Art. 2506. When there is a promise of warranty, or when no stipulation was made on that subject if the buyer be evicted, he has a right to claim against the seller:

"(1) The restitution of the price.

"(2) That of the fruits or revenues, when he is obliged to return them to the owner who evicts him.

"(3) All the costs occasioned, either by the suit in warranty on the part of the buyer, or by that brought by the original plaintiff.

"(4) The damages, when he has suffered any, besides the price that he has paid."

"Art. 2510. If the seller, knowingly and dishonestly, has sold the property of another person, he shall be obliged to reimburse to the buyer all expenses, even of embellishments of luxury, that the buyer has been at improving the premises."

We think that in this case the defendants must be held to the knowledge that they were selling the property of another without authority to do so; and that, therefore, they must be held to have acted in legal bad faith, however honestly they may have believed (as the court is entirely satisfied they did) that their act would be ratified by the owner of the property.

"Si vous l'avez vendu sachant qu'il était à autrui, vous êtes coupable de dol." Mourlon on article 1149, C. N. Napoléon. Anglice, "If you have sold it, knowing that it belonged to another, you are guilty of bad faith."

Warvelle on Vendors and Purchasers, p. 969:

"But, where the vendor contracts to sell lands which he knows at the time he has not the power to convey, he must abide by his contract, and should be held to make good to the vendee any loss he may sustain by reason of his violation; nor is it any excuse in the vendor in such case that he may have acted in good faith and fully believed when he entered into the contract that he should be able to procure a good title for his purchaser"—citing People v. Albany & V. R. Co., 24 N. Y. 261, 82 Am. Dec. 295; Hill v. Hobart, 16 Me. 164; Ludwick v. Beckamire, 15 Ind. 199; Bitner v. Brough, 11 Pa. 127.

Drake v. Baker, 34 N. J. Law, 358:

"The defendant in this case knew when he agreed to make a perfect title to this property that it was altogether uncertain whether he would be able to do so, for his ability to discharge his contract was dependent upon the consent of his wife. With the full knowledge of his power of performance being contingent, he entered into this absolute stipulation, and I think this circumstance should take this case out of the rule adopted in Fleureau v. Thornhill, (2 Wm. Bl. 1078). * * *

"In my judgment the immunity of the vendor does not extend beyond his inability to perform his contract by reason of a defection in his title which was unknown to him at the time he entered into the contract to sell. This rule will exclude all defaults which are willful, or which arise from the contingencies known to

the vendor, and of which he consciously assumed the risk. * * * "

Brinckerhoff **v.** Phelps, 43 Barb. (N. Y.) 469:

"The defendant as trustee agreed to sell land, but was prevented from carrying out the contract because the cestui que trust refused her consent. It is by no means clear, I think, from the evidence, that the defendant proved that he acted in good faith, or that he was in a position to claim that such was the fact. But suppose he had established good faith on his part, does that improve his condition, if he had knowledge that he had no right to convey? It was not the want of good faith upon which the decision was made by the general term, but upon the fact that he had knowledge or arbitrarily refused to convey. Either the one or the other made him liable. If he sold the land knowing that he had no authority to convey, then the question of good faith cannot arise, and he cannot and is not entitled to any protection upon that ground. If under such circumstances he assumes to sell without being in a position to convey, and without the power to confer any title, he does it at his peril, and cannot claim the protection of a vendor in good faith. He violates his contract, and must be held responsible for the damages sustained by a breach of it."

In Pumpelly v. Phelps, 40 N. Y. 59, 100 Am. Dec. 463, a case involving the same facts as that just cited, the court said:

"The defendant must be held personally liable on this contract. It is essentially his contract. In order to exempt the contracting party from personal liability, he must so contract as to bind those he claims to represent."

Bush v. Cole, 28 N. Y. 261, 84 Am. Dec. 343:

"If it appears that the auctioneers knew they were not authorized to sell the premises for less than $2,800, when they struck them off to the plaintiff at $2,250, he will also be entitled to recover what the premises were worth over and above the price he was to pay therefor."

Having been in bad faith (we mean legal bad faith), defendants are responsible, not only for the damages they contemplated, but also for those which are "the immediate and direct consequence" of the breach of their contract.

And we think that the necessity under which plaintiffs found themselves to pay this larger price was the direct and immediate consequence of defendants not having carried out their contract. The plaintiffs had imperative need of a large tract of land, some 35 acres, and had acquired it by closing the options, synchronous with that involved in this suit, which they had secured on the numerous lots composing this large tract, all at an expense of some half a million dollars, and these four city lots were enclaved within this large tract; so that either these lots would have to be acquired or the plan thus far carried out at so large an outlay would be marred and disfigured or altogether defeated. There can be no denying that the plaintiffs were under the necessity of buying these lots. True, this necessity was not created solely by the default of defendants; but it came about through the default of defendants operating in conjunction with existing circumstances, or superadded to the existing circumstances. By having closed all the options simultaneously with that in question in this case, the plaintiffs found themselves committed beyond recall to a plan or scheme which included as an essential part the acquisition of these Woodworth lots. Hence, in the chain of moral or legal, if not in that of natural, causation, the necessity to pay this surplus price was the immediate and direct effect of the breach of defendants' contract.

[4] If, however, we were mistaken in that regard, and even if defendants are absolved altogether of bad faith, still they are liable. The damages claimed may reasonably be supposed to have entered into the contemplation of the parties. They were contracting for the delivery of an article which could not be duplicated in the market. Hence they could not have contemplated the possibility of the purchaser protecting himself in the event of a breach by purchase in the market; and could not mentally have restricted the probable consequence of a breach to the difference between the market price and the contract price. They must have known that in the event of a breach the purchaser would

have to acquire the property as best he might from the true owner, and they must inevitably have contemplated as damages the increased price which the purchaser might have to pay the rightful owner as a condition to acquisition.

As was said by Sharswood, J., in 73 Pa. 365, McHose v. Fulmer, quoted with approval in Sedgwick on Damages, p. 236:

"If an article of the same value cannot be procured in the market, its market price cannot be ascertained, and we are without the necessary data for the application of the general rule. This is a contingency which must be considered to have been within the contemplation of the parties, for they must be presumed to know whether such articles are of limited production or not."

The special circumstances of this case show that the damages which have actually ensued must have entered into the contemplation of the defendants. The Tulane administrators planned to acquire all of the large tract of land in question or none of it. They would not authorize a contract to purchase any of the property until they could be assured of having it all.

They notified Saxton accordingly, and required him to exhibit to them options concerning all the property before they authorized him to close for any of it.

And defendants knew that Saxton was negotiating for all the property and wanted it all. They knew that the contracts for lots Nos. 64, 66, 72, and 74 formed part of a general scheme to acquire a large block of property, and must have contemplated the importance to Saxton's principal of acquiring these particular lots along with every other lot in that block. They must have known that, if Saxton's principal could not secure any one of the lots in the general scheme, the success of his whole scheme would be seriously jeopardized if not fatally endangered. They must, therefore, have known that the purchaser would have to take every possible means to acquire all of the property after he had acquired the chief portion of it,

and that each particular lot would have a special value to the purchaser. It must accordingly have been within their contemplation that, if after the chief portion of the property had been acquired there was a breach of contract to deliver four particular lots in the middle of the property, the purchaser would be compelled to acquire that property at the lowest figure which he could induce the owner to accept. Even if the price paid Woodworth could fairly be said to be somewhat in excess of the reasonable value of the property, the defendants must yet be held to account for that price because they knew, or should have known, that, when they took the risk of obtaining Woodworth's consent, they exposed the purchaser to the risk of being made to pay to Woodworth a larger price than he might otherwise have been able to demand. It was the defendants who took the risk, and it is they who should pay for having taken it. If Woodworth did in fact "hold up" the plaintiffs, it was defendants who made it possible for him to do it, and they knew that they were making it possible. They should suffer for it.

Sutherland, Damages, p. 165:

"Damages are not the primary purpose of contracts, but are given by law in place of and as a compensation and equivalent for something else which had been agreed to be done, and has not been done. What the damages would ordinarily be on such a default is immaterial if the contracting party assume the obligation which he has broken with a knowledge of a peculiar state of facts connected with the contract which indicated that other damages would result from a breach, and the latter are claimed. To confine the injured party's recovery in such case to the lighter damages which usually follow such a breach, where no such known special facts exist and exclude those which were thus brought within the contemplation of the parties, would be to sacrifice substantial rights to arbitrary rule. To set aside the principle which entitles a party to compensation commensurate with his injury to give effect to a rule formulated to render that principle effectual, it would be to apply a subordinate rule where it has no application, instead of the principle which is paramount and always applicable."

It is not necessary under the rule of Code, art. 1934, that the exact extent of the dam-

ages which have ensued should be within the contemplation of the parties. It is sufficient for the purpose of that rule if they can foresee damages of the sort which have ensued without foreseeing their precise sum. This is pointed out by Baudry-Lacantinerie in his comments upon the provision of the Code Napoléon corresponding to said article 1934.

Baudry-Lacantinerie, Obligations, par. 486, p. 460:

"D'ailleurs, selon nous, pour que les parties soient considerées comme ayant pu prévoir les dommages-intérets, il n'est pas nécessaire qu'elles aient pu en connaitre d'avance la quotité, autrement dit l'importance. * * * La théorie que nous adoptons n'est pas admise par tous les auteurs. Certains prétendent que la disposition de l'art, 1633 est exceptionelle. D'après eux, le débiteur de bonne foi est seulement tenu jusqu'à concurrence de la somme à laquelle il a pu prévoir que se monterait le préjudice résultant de l'inexecution.

"A notre avis, cette théorie est incompatible avec le but des dommages et intérets. Ce but est de mettre le créancier dans le même étât que si l'obligation avait été executée. N'est-il pas évident qu'il ne sera pas atteint si le créancier n'est pas indemnisé de tont le préjudice que lui cause la privation même de la chose, objet du contrat? On nous oppose le texte de l'art, 1150. Cette disposition, fait-on observer, restreint le responsibilité du débiteur de bonne foi aux dommages et intérets euxmêmes et non pas simplement leur cause. A cette objection, nous faisons une double réponse. D'abord, il est presque toujours impossible, par la nature même des choses, que les contractants puissent prévoir l'importance des dommages et intérets. * * * En outre, Pothier, dont les expressions ont passé dans l'art. 1150 donne au principe la même portée que nous."

The common-law authorities are to the same effect. It is the nature, and not the extent, of the consequences of breach, that the vendor is entitled to notice of. See Sedgwick on Damages, p. 239; Sutherland on Damages, p. 2856.

Defendants urge that, although they admittedly knew that Saxton and his principal desired all of the property in and about block 2, Audubon Place, they did not know the purpose for which the property was desired or the identity of Saxton's principal. To this two answers may be made: First.

That the authorities are unanimous that the notice of special circumstances to charge a defendant with liability for consequences need not be detailed or precise. It is sufficient if its general character apprises defendant of the importance of performing his obligation and of the peculiar gravity of the consequences of nonperformance. See Baudry-Lacantinerie and other authorities cited supra. The notice here certainly filled that purpose. Second. That knowledge of the identity of the principal or of his particular purpose was immaterial, unless it were shown that, because of the particular purpose for which the Tulane administrators desired the property, Woodworth was enabled to demand and receive a larger price than any one else likewise desiring all the property for some other purpose would have paid and had to pay. The record contains no suggestion to that effect, and certainly the intrinsic probabilities are all to the contrary. The important factor was the desire for all of the property—the reason for that was of no consequence. It was the desire for all the property that established the importance of securing it all; and their knowledge of the plans to secure it all put defendants upon notice of the consequences which would flow from breach of contract on any piece of the property. The result would have been the same if Saxton's principal had been a land speculating syndicate planning to acquire all of the property whether for residential, or for parks, or for manufacturing, or for railroad, purposes. The important point in all these cases would equally have been the acquisition of all the property contracted for—and that factor would be constant, no matter what the principal's identity or what his purpose. When the defendants knew that Saxton's principal wanted all the property, they knew enough, being within their contemplation, the necessity under which the latter would be to acquire

on the best terms possible the four lots in question as to which they defaulted.

The learned counsel for defendants argue very forcibly that if it be true that the measure of the damages is the price which was paid to Woodworth, and not the market value of the property, then that if Woodworth had demanded $100,000, or any other fanciful sum, and plaintiffs had paid it, defendants would have to reimburse that extravagant sum to plaintiffs, and be ruined by the operation.

Our answer is that, if any manifestly unreasonable amount or any amount bordering on the fanciful had been demanded by Woodworth and paid by the plaintiffs, the court would have been called upon to consider whether to allow it or to trim it down to the measure of reason, and we should have the authority of the civilians for doing it.

"With regard to those damages for which a debtor is liable by reason of his not having fulfilled his obligation in a case where there has been no bad faith, it remains for us to say that, where the damages are considerable, they ought not to be taxed with strictness, but with a certain moderation. * * * The principle on which this decision is founded is that obligations springing from contract can come into existence only by the will and consent of the parties. Now, the debtor in consenting to be liable for the damages that might result from the inexecution of his obligation must be deemed to have neither understood nor consented to bind himself except up to the highest amount that he could reasonably have contemplated the damages might reach, and not beyond said amount; hence, when the damages happen to attain an excessive figure, up to which the debtor could never have supposed they could possibly rise, they must be reduced and moderated to such a sum as would be the highest which it could reasonably have been supposed they might come to, the debtor not being deemed to have consented to bind himself any further than this." Pothier, Obli. No. 164, p. 84.

According to the contention of the defendants, although the plaintiffs made this firm and fast contract, and through its breach suffered these damages, they can recover nothing. This cannot be, and is not, the law.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that the plaintiffs, the administrators of Tulane Educational Fund, have judgment against the firm of Baccich & De Montluzin and the individual members of said firm, Milton A. Baccich and Ross E. E. De Montluzin in solido, in the sum of $5,028, with legal interest thereon from this date, and costs.

MONROE, J., concurs.